Please the court. I'm reserving five minutes for rebuttal. My name is Daniel Craig, and I represent the appellant Muhammad Abdurrahman On December 13th of 2016, appellee Governor Dayton submitted a certificate of ascertainment of electors, presidential electors, for the state of Minnesota that identified my client, Mr. Abdurrahman, or excuse me, Dr. Abdurrahman, as an elector for the state of Minnesota. This was a result of Hillary Clinton and Tim Kaine winning the popular vote in the state of Minnesota. And on December 19th, my client attended the meeting of the electors pursuant to Article 2 and Amendment 12 of the US Constitution, and he voted for Bernie Sanders for president and Tulsi Gabbard for vice president. Like Alexander Hamilton, my client believes that presidential electors have a duty to exercise independent judgment in rendering their votes, but inconsistent with my client and Alexander Hamilton's understanding, the Secretary of State of Minnesota deemed Dr. Abdurrahman to have vacated the office of presidential elector because Minnesota has adopted the Uniform Faithless Presidential Electors Act, which provides that if an elector does not vote consistent with the popular vote, he or she vacates his office and an alternate is seated. And that is what happened on the 19th. Does the record show how many states have that act? I'm not sure if it's in the record, but I believe the answer is five, Your Honor. But returning to the 19th, my client was essentially, by the Secretary of State, was told that his vote would not count. An elector by the name of Jill Garcia was seated, and the very next day, the Secretary of State and the governor rushed off an amended Certificate of Ascertainment, which no longer identified my client as a presidential elector. Instead, identified Ms. Garcia and contained the Certificate of the Votes for President, and that was sent to the Vice President in his capacity as President of the Senate. We acted very quickly to go to the district court. We filed our complaint the same day, December 19th, as my client's rights as an elector were violated. We sought a temporary restraining order and a preliminary injunction. We were able to be heard by the district court three days later. The TRO motion was converted to one for preliminary injunction,  excuse me, Your Honor. My one-year-old gave me a cold today, so I apologize, but on December 23rd, the district court denied our motion for preliminary injunction and also, in a very surprising turn of events, dismissed the entire case as moot. We did not have notice of this. While mootness came up at the preliminary injunction hearing, it was really in the context of the fact that the state had rushed off the ballots after receiving notice of our lawsuit. Now, nonetheless, we did do whatever we can to expedite the resolution, or at least the preliminary resolution of the case, filed a motion for emergency injunction in this court, which was denied, and we filed an application for injunction with Justice Alito as circuit justice, and that application was also denied. And while we disagree with Judge Magnuson that the case was moot, in fact, essentially by December 23rd, we felt that he still could have enjoined the Secretary of State to send on a second amended Certificate of Astertainment. It was clear by January 6th, when Congress met in joint session to count the electors' votes, that the case was moot, in fact. And so we believe the case essentially became moot, in fact, while it was pending in this court as we filed a notice of appeal on December 27th of 2016, I believe. And so what we're here today to discuss is whether this case is capable of repetition yet evading review. And I'd first like to address evading review because the the district court had no issue or even really saw no need for no deep analysis to conclude that a case like this could not be fully litigated given the the realities of an election law case like this. And when we speak of fully litigated, the cases make clear that we're not just talking about a preliminary injunction. We're talking about a full final judgment on the merits through any available appeals. This court's Van Bergen decision makes that clear, that when we talk about evading review, appeals must be fully litigated for a case to not meet that evading or potentially fully litigated to not meet that standard. So what is the specific issue that you say remains or is something that is going to be this continuously repeatable injury? The constitutionality of the Uniform Faithless Presidential Electors Act, essentially whether the state has power to remove a elector after he or she has fully exercised their authority. And so which sort of brings me into the next thing I'd like to discuss regarding evading review. The appellees rely almost entirely on Ravy Blair and sort of shift the evading review analysis really towards a latches analysis, which we don't think is opposite. The appellee's point seems to be that Ravy Blair, which, while it dealt with presidential electors, actually has a very different issue. Ravy Blair is about the constitutionality of a state's power to require electors to take an oath to vote in accordance with the popular vote. And Mr. Blair started a mandamus action in Alabama state courts because he wanted to go on the primary ballot as an elector without taking that oath. His injury, in fact, was that he was to be excluded from the primary ballot for the refusal to take his oath. In this case, my client's injury, in fact, is that his vote was disregarded by the state. His injury did not accrue until December 19th of 2016. The appellees seem to argue or do argue that my client should have filed when the DFL Congressional District 5 Convention nominated him to be a potential presidential elector. Of course, he didn't know who he was going to vote for or who the nominee of the Democratic Party would be at that time. Hillary Clinton only became the nominee on July 31st, and he wasn't appointed until sometime after November 8th of 2016. And so essentially, the question is of when this case arose can only be at the time where he is actually appointed and exercises his right to vote because the state has plenary power up until the moment of appointment over these electors. This very issue is one that was left open in Ray V. Because he had actually signed the commitment before he chose to vote contrary to it. Correct, Your Honor. So why wouldn't it have arisen when he knew he was going to vote differently than, I mean, as soon as he knew his conscience was in conflict with the commitment he'd made, wouldn't that have been the appropriate time to raise an issue? It could have been, except the state may have still had a plenary power to remove him as an elector because his appointment had not become final. So essentially, the state could come in and say, if you decided to change your mind on December 1st, we still haven't sent in the certificate of ascertainment until December 13th, and we, pursuant to the plenary power that the Supreme Court has recognized, can simply remove you from office at that point. And it's a little unclear when exactly the appointment becomes final, but it is beyond logic to say that the appointment was unfinal after my client had discharged all the duties of his office by voting. It becomes indisputable that he was appointed as an elector by the time he votes. If an amended certificate of ascertainment could have been sent off on December 14th. My point is, as soon as he understands it, he has made a commitment and has an issue of conscience that may make that issue, that may make it impossible for him to fulfill that commitment, that at that point, this law is already working against him. At that point, understand, he should have a remedy to seek to avoid the unconstitutional enforcement of a law to prevent him from doing something in violation of his conscience. Well, and if that's true, Your Honor, then we only extend our timeline by a week or maybe two. And so we still don't have enough time to actually litigate this case. And so I do want to address the capable of repetition element of this. And we believe this standard based on the Supreme Court's cases and this court's cases is actually very low. And we think this reflects the wise understanding that courts are not in a great position to predict the future. And when they have predicted the future, it frequently turns out in another case that the thing that the court said was not going to happen does happen.  And Wisconsin right-to-life cases is simply that there's a reasonable expectation that the issue is capable of repetition. It is a standard lower than a preponderance of the evidence or more likely than not. And in this court's cases, for instance, the Van Bergen case, the court was able to hold that a case was capable of repetition, an election law issue involving someone who wanted to run was capable of repetition when the plaintiff did not even have a stated intent to run again. In this case, my client does have a stated intent again to be an elector for the DFL party, which brings me to the motion we filed to supplement the record. Which case did you just mention that involves someone who did not have a stated intention? The Van Bergen case, Your Honor. And likewise, in the Connor and Clark cases, there was also not a clear... Those involved essentially a Missouri law where one had to register a committee 30 days before an election to engage in certain political activities. And in both of those cases, the organization that wanted to expend funds within 30 days didn't actually have a plan or a reason yet identified for why it might not be able to meet the 30-day requirement. And so in election law cases, the standard is exceedingly low. And we believe we have exceeded that standard because my client has identified in his declaration and intention to be an elector again. Also in the declaration of Caroline Hooper, who was the DFL delegate who nominated him, that she again intends to become a delegate and nominate him, and that his decision to vote for Bernie Sanders was well received in Congressional District 5. So, well, that's in the motion to supplement the record, which is pending before the panel. Because this case was pending for four days and we had no notice that it would be dismissed on mootness grounds, there is no factual record whatsoever upon this issue. And again, as I point out, really, the case became moot, in fact, while it was pending in this court on January 6th when Congress opened the ballot. Well, you say you had no notice. What was discussed about mootness? I thought the response to the... I thought it was raised in the pleadings on the injunction motion and then discussed at the hearing. So in the Apole's brief, which was filed the night before, I believe, the preliminary injunction hearing, they did raise it. We did not have enough time to file a reply. And in any event, we were briefing the preliminary injunction, not the entire case. And mootness, there's not going to be an injunction if there's no case or controversy. So that's going to be a preliminary issue in any injunction proceeding. That's correct. But I think it's also important to understand that the mootness issue was very different when it was before the District of Minnesota. Because the mootness issue there was the state was essentially saying, we already sent off the ballots and an amended certificate of ascertainment. And so it's a done deal. And the District of Minnesota did agree with that. But it was our position below that you've already sent off an amended certificate of ascertainment once. There certainly is enough time to do it again. And so the mootness issue was very different in the district court. You thought it was different. Judge Magnuson didn't agree with you. But you thought because you had a good argument that he was wrong on that, you didn't have to raise capable repetition, yet evading review? We did raise it briefly at the oral argument. So that was discussed. And I'd also point out the distinction. You had notice and you even raised it. But you just didn't make a record. At that point, you could have said, they've raised mootness. We think it's capable of repetition. And we need leave to submit these documents that you're now trying to submit on appeal. And I would submit, Your Honor, that because we were discussing a preliminary injunction that was dealing with specifically sending the ballots to Washington and not a declaratory relief claim, which was simply declare the statute unconstitutional, those were two very different issues. One was the fact of, we're asking for an injunction judge to enjoin Secretary Steinman and the governor to send my client's votes to Washington versus the declaratory judgment claim, which is simply declare that Minnesota's adoption of the Uniform Faithless Presidential Electors Act is unconstitutional and essentially repugnant to Article 2 and Amendment 12. And I would like to reserve the balance of my time, Your Honor. Thank you, Mr. Craig. Mr. Hartshorn. Good afternoon, Your Honors. May it please the Court. My name is Nathan Hartshorn. I'm an Assistant Attorney General for the state of Minnesota. I'm here representing the Appalese in this matter, who are Governor Dayton, Attorney General Swanson, and Secretary Steinman. I want to start just by picking up on a point that Judge Smith made during Mr. Craig's remarks, specifically having to do with when the cause of action in this case arose. And Judge Smith pointed out, I think, very appropriately, that at that point, that Mr. Abdur Rahman had signed a pledge promising to vote for the Democratic nominee for president, who at that point he knew was Hillary Clinton. That is a point at which he absolutely was in a position to say, I am being held by Minnesota law, by this statute that is now being challenged, to do something that is inconsistent with my conscience and inconsistent with what I believe are the authorities of a presidential elector. Absolutely, at that point, he could have, and he certainly had standing to, file a federal claim to that effect. Now, Mr. Craig represented that that only changes the timeline a few weeks. That's not correct. That is not an accurate reflection of the record. Mr. Abdur Rahman signed that pledge at some point in August of 2016. At latest, August 15th of 2016. August 15th is when the secretary's staff received the pledges from the DFL, saying here are the pledges signed by our nominees for electors. So August 15th is the absolute latest date at which Mr. Abdur Rahman signed that pledge, and therefore, under this particular rubric, the latest time at which a claim arose under this reasoning. Now, Mr. Craig has... Had he become an elector at that point? He had not. He could have raised the issue before he was even an elector? That's correct. And Mr. Craig is correct that the basis for that is the one and only other appellate decision on the rights of presidential electors, specifically under Article II and the 12th Amendment, which is Wray v. Blair. And the procedural history of Wray v. Blair proves that the proposition you've just introduced is indeed correct. Well, but that case, I thought the person had to sign a pledge there. And that's exactly what Mr. Abdur Rahman was doing in August as well. But the important point... Excuse me. The important point about that implicit and necessary holding with regard to standing in Article III is that at that point, it happened to be in March of 1952, Mr. Blair was in a position to invoke the rights and authorities, the duties and authorities of presidential electors, even though it was March. And the presidential election wouldn't be held until November. Indeed, Mr. Blair had to win two different elections. He had to win in a primary election in May, and then Adlai Stevenson had to win the general election in November. So the fact that those elections hadn't taken place did not bar him from stating federal claims, from standing in the shoes of an actual presidential elector. Mr. Craig says, attempting to rebut this argument, that Blair's injury, in fact, was being required to take the oath. OK, explain how that is an injury, in fact. What law says he cannot be required to take an oath? He claimed the law that says he can't be required to take an oath is Article II and the 12th Amendment, which, according to him, provide that presidential electors cannot be required to take oaths. He wasn't a presidential elector. He wouldn't, under any circumstances, become a presidential elector until November. Nonetheless, in March, the Supreme Court accepted certiorari and issued a decision on the merits, necessarily holding that there was a federal question, that there was an Article III case to be made in March, with two elections still to come, that Mr. Blair could assert federal rights. Which means that, in this case, in August, after Mr. Abdurrahman had signed this pledge and said, knowing at that point that he was going to be required to cast an electoral vote that was contrary to his conscience, that that was the case, and that he was being put to a situation that he believed to be unconstitutional. He didn't. He did not act in August or September or October or November, or even in the early part of December, when three other lawsuits were filed in federal court, one in Washington, one in California, one in Colorado, challenging related kinds of statutes. I don't think any of those states have exactly the same form of statute. Even at that time in December, Mr. Abdurrahman still sat on it. And only at the absolute last second, after the process had taken place, the convention of the electors had taken place, did he finally drop these pleadings and three motions on the state. So I want to move then to the prong of the mootness exception that the district court did directly address and hold was the grounds under which the mootness exception doesn't apply, and which is that this is not capable of repetition, or that the only way- The court's analysis on the timeliness was that he didn't have enough time. Is that what the court said, that the time is not a bar to- Well, that specifically on the exception to mootness, the exception to mootness that this evades review, the court did hold that this does evade review on the premise that his cause of action did not arise until November 9th, on the premise that he didn't have a cause of action until he was an elector. But Ray v. Blair shows that can't be right, because if that were correct, then Blair wouldn't have had a cause of action. But Blair did, because Blair's rights, standing in the place of a presidential elector,  But it isn't necessary for this court to agree with the appellees on that particular prong of the mootness exception in order to uphold the district court's decision. Indeed, the district court's main grounds for this decision, and the district court is quite correct about this, was that this case is not capable of repetition, or that the only way one could conclude that this case is capable of repetition with regard to Mr. Abdurahman is to speculate wildly about what could or is likely to happen in the future. And an important factual point, I think, to pay attention to, and to focus on in the court's analysis of that question, is the fundamental dishonesty that is at the core of the facts here. The district court held that at least as of November 9th, the latest, as of November 9th, the appellant was planning to ignore his oath and vote for someone other than Secretary Clinton and Senator Kaine. Though Mr. Abdurahman didn't tell anybody, did not notify the state, didn't notify the party, kept that to himself until the absolute last possible moment. The fundamental dishonesty of that is something that is core to the district court's decision, and is absolutely relevant to the question of whether this is capable of repetition. Because, as the district court notes, it is at best speculative to say that a political party, having seen Mr. Abdurahman promise to the party, promise to the people of Minnesota, I will vote for the Democratic nominee, seen him promise that, then seen him break that promise at the last second, in such a way as to make it as hard as possible for the state to respond to his claim. The notion that having seen this appellant do that, the Democratic party would then nominate him to be an elector again. To say that it's speculative that that would happen is being very kind. Dubious might be a better word to use. And under those circumstances, which the district court did specifically call out and analyze, it is at best speculative. And the standards Mr. Craig has represented, that the standard this court has provided is very, very low. Well, in point of fact, this court and federal case law is very clear that a party seeking to use this exception to the mootness rule can't get there with, quote unquote, speculative contingencies. And this is at best a speculative contingency. Mr. Craig mentions that he has found an affiant who says, well, I will put his name in nomination for an elector. There is no way for that woman or anyone else to know that she is going to be a delegate to the convention that would be allowed to do that. There are two levels of precinct caucuses and senate district conventions that that person or any other friend of Mr. Abdur Rahman's would have to get through in order to be qualified to put his name into nomination. So the entire structure of the notion that this could happen to Mr. Abdur Rahman again is at best wholly speculative. And frankly, we would submit it's more than speculative. It's extraordinarily unlikely that if there is any person who is less well-suited to be a presidential elector within the Democratic Party in this state, it's hard to imagine who that person could be. Now, that then deals with the two different prongs of the mootness exception. So I just wanted to address a couple of the other issues that come up either from the briefing or in one case from Mr. Craig's remarks. Mr. Craig mentioned that the Appellees in this case had, quote unquote, rushed off the ballots after the convention of the electors. That, in fact, is required by federal law. Specifically, three USC, sections 6 and 11, they require that those materials to be submitted to the federal government, quote unquote, forthwith. And I believe that's section 11. I think section 6 says as soon as practicable. Now, from the Appellees' perspective, that was the next day. And that, indeed, on December 20th is when those materials were submitted.  made sure to hurry to get this out the door before anyone could stop them is not founded. And, in fact, what they were doing is following federal law, as federal law specifically commanded. I also wanted to address one thing Mr. Craig, I guess, didn't have time to, which was the 11th Amendment argument that has come up in the Appellees' brief. And I would just point out there that the 11th Amendment argument in the Appellees' brief is founded entirely on appellant's interesting decision not to appeal the district court's decision with regard to the mootness of their claim for injunctive relief. Appellant certainly could have appealed the district court's decision in its entirety. The complaint in this case seeks injunctive relief, permanent injunctive relief. It also seeks a declaratory judgment. The district court ruled that that's all moot and dismissed it all. The appellant here has stated that they are only contesting that they are only appealing that ruling as to the declaratory relief and not as to the injunctive relief. This and only this creates an 11th Amendment problem. There's no 11th Amendment problem with the complaint as it originally stood. But now that we have a claim for injunctive relief that has been ruled moot and that the appellant has conceded to that, has waived any claim that that ruling on mootness was improper. And now here we are on an appeal where the only challenge they are making is to the mootness of the declaratory judgment. That contemplates then, if appellant prevails on this appeal, that contemplates a continued lawsuit in which only declaratory judgment is being sought. There is no claim for injunctive relief at all. That fails the Green v. Mansour and 281 CARE standards. Under 281 CARE, a lawsuit can only proceed against a state under the Ex parte Young exception if that lawsuit is seeking injunctive relief that is properly termed prospective. Again, the original complaint had no problem with that. And if we said that declaratory relief is not prospective and therefore is not subject to the exception. The Green v. Mansour case stands for the notion that declaratory relief on its own is not sufficient to meet the standard that Ex parte Young requires. That if declaratory relief is all that a plaintiff is seeking, then the 11th Amendment bars that lawsuit. Now, a very easy way to deal with that problem for a plaintiff is to also seek prospective injunctive relief. Then under 281 CARE, as long as the complaint seeks injunctive relief that is properly categorized. Do you think they've said we want a declaration without an injunction now? That is the necessary implication of the portion of the district court's decision they've decided to appeal and the portion they didn't. I frankly don't understand why they've decided to go at it that way. They certainly could argue that the entire thing is subject to the mootness exception. But they haven't done that. They've decided to only appeal the portion dealing with declaratory relief and not the portion dealing with injunctive relief. It's an interesting decision to do that. But having done that, they are now contemplating a surviving lawsuit that would be for declaratory relief only and not injunctive relief. And both 281 CARE and Green v. Mansour make it clear that that is not sufficient, that when declaratory relief is all that's being sought, that's barred by the 11th Amendment. That's all I've got. If the court has no further questions, then I will sit down and let Mr. Craig back up. Thank you. Thank you, Mr. Hartshorn. Mr. Craig, your rebuttal. Thank you, Your Honors. I'll briefly note the Green case does not say what Appellee's counsel says it does. The fundamental distinction in the ex parte young exception is whether the relief sought is prospective or retrospective. In Green, the party sought a declaration that only said that in the past, there was a violation of law. We are seeking to declare this law unconstitutional on a going forward basis. Is he right that you're not appealing the denial of the injunction? Well, the injunction was only to essentially send my client's vote to Washington. We proceeded on the basis, this court and the Supreme Court have said that a declaratory judgment against the government is the functional equivalent of an injunction because we expect public officers to follow the law as declared by this court. You're saying there's no point in an injunction relating to the prior election at this point? Correct. Correct. If the Secretary of State were to somehow not follow the declaratory judgment, we could then proceed for supplemental relief of an injunctive nature. But we believe the Appellees will actually follow the law as declared by the court. Thank you, Your Honors. Thank you, Mr. Craig. Court wishes to thank both counsel for your presence and argument this morning. We will take the case under advisement, render decision in due course.